No. 25-447

_____
_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

STATE OF OREGON,

      Plaintiff-Appellant,

          v.

SAMUEL TROY LANDIS,

      Defendant-Appellee.

_____

APPELLANT'S OPENING BRIEF
_____

Appeal from the United States District Court
for the District of Oregon
_____

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
PHILIP THOENNES
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
philip.thoennes@doj.oregon.gov

Attorneys for Appellant

_____
_____

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF BAIL / DETENTION STATUS ...........................................2

STATEMENT OF JURISDICTION ....................................................................2

    A.    District Court Jurisdiction ...............................................................2

    B.    Finality of Judgment and Appellate Court Jurisdiction ..................2

    C.    Date of Entry of Judgment and Timeliness of Notice of Appeal ............................................................................................3

ISSUES PRESENTED FOR REVIEW .................................................................3

STATEMENT OF THE CASE ...........................................................................4

    A.    Nature of the Case ...........................................................................4

    B.    Course of Proceedings and Disposition Below................................4

STATEMENT OF FACTS ...................................................................................6

    A.    The March 28 Surveillance Operation .............................................6

    B.    While trying to regroup with the surveillance team, defendant strikes and kills the victim as he drives through an intersection on a residential street.....................................................8

    C.    DEA policy allows agents to violate traffic laws only in certain emergency or enforcement situations. ...............................12

    D.    Defendant and other officers testified to the grand jury; defendant explained that he was driving with a sense of purpose but without urgency............................................................14

SUMMARY OF ARGUMENT ..........................................................................18

STANDARD OF REVIEW ...............................................................................19

ARGUMENT...................................................................................................22

    A.    A federal officer is entitled to immunity from state criminal

i

prosecution only when the officer's conduct is both authorized by federal law and objectively reasonable in the circumstances. ..................................................................22

B.   The district court failed to account for the allegations in the indictment and failed to view the record evidence in the light most favorable to the state.............................................26

    1.   The district court was required to accept as true the state's allegation that defendant was criminally negligent...........................................................26

    2.   The district court improperly viewed the record evidence in the light most favorable to defendant's claim of immunity...............................................28

C.   The district court erred in granting defendant's motion to dismiss because a rational factfinder could conclude that defendant's conduct was not objectively reasonable in the circumstances. ..................................................................34

CONCLUSION...........................................................................42

EXCERPT OF RECORD

## TABLE OF AUTHORITIES

### Cases Cited

*Act Up!/Portland v. Bagley*,
    988 F.2d 868 (9th Cir. 1993)....................................................21

*Boyce Motor Lines, Inc. v. United States*,
    342 U.S. 337 (1952) ......................................................... 20, 26

*California v. Mesa*,
    813 F.2d 960 (9th Cir. 1987),
    *aff'd*, 489 U.S. 121 (1989).................................................. 35, 36

*City of Norfolk v. McFarland*,
    143 F. Supp. 587 (E.D. Va. 1956)............................................36

*Clifton v. Cox*,
    549 F.2d 722 (9th Cir. 1977)....................................................25

*Idaho v. Horiuchi*,
  253 F.3d 359 (9th Cir.) (en banc),
  *vac'd as moot*, 266 F.3d 979 (9th Cir. 2001) (en banc) .................... 21, 25

*In re Neagle*,
  135 U.S. 1 (1890) ............................................................................. 23, 25

*Kentucky v. Long*,
  837 F.2d 727 (6th Cir. 1988)...................................................... 19, 20, 34

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ..................................................................22

*Morgan v. California*,
  743 F.2d 728 (9th Cir. 1984)............................................................. 20, 37

*New York v. Tanella*,
  374 F.3d 141 (2d Cir. 2004)................................................. 19, 20, 21, 28

*North Carolina v. Cisneros*,
  947 F.2d 1135 (4th Cir. 1991).......................................................... 36, 41

*Ohio v. Thomas*,
  173 U.S. 276 (1899) ..................................................................................23

*Osborn v. Bank of the United States*,
  22 U.S. (9 Wheat.) 738 (1824) .................................................................22

*State of Oregon v. United States District Court for the District of Oregon, Eugene*
  (24-161) ......................................................................................................2

*State v. Lewis*,
  290 P.3d 288 (Or. 2012)............................................................................27

*Torres v. City of Madera*,
  648 F.3d 1119 (9th Cir. 2011)...................................................................38

*United States ex rel. Drury v. Lewis*,
  200 U.S. 1 (1906) ......................................................................................24

*United States v. Cloud*,
  102 F.4th 968 (9th Cir. 2024)....................................................................21

*Wyoming v. Livingston*,
  443 F.3d 1211 (10th Cir. 2006)................................. 19, 20, 21, 22, 25, 28

iii

## Constitutional and Statutory Provisions

28 U.S.C. § 1291.................................................................................................3

28 U.S.C. § 1442(a)(1).................................................................... 1, 2, 4, 5, 36

Or. Rev. Stat. § 161.085(10)..............................................................................26

Or. Rev. Stat. § 161.605(2).................................................................................4

Or. Rev. Stat. § 163.145.................................................................................4, 26

Or. Rev. Stat. § 163.145(1).................................................................................4

Or. Rev. Stat. § 163.145(2).................................................................................4

Or. Rev. Stat. § 820.300(1)(b) ..........................................................................13

Or. Rev. Stat. § 820.300(2)(a) ..........................................................................14

Or. Rev. Stat. § 820.300(2)(b) ..........................................................................14

U.S. Cont., Art. VI § 2 .......................................................................................22

## Other Authorities

Fed. R. App. P. 4(b)(1)(B)(1) .............................................................................3

Fed. R. Crim. P. 12(b)........................................................................ 2, 4, 5, 19

## APPELLANT'S OPENING BRIEF
_____

### INTRODUCTION

Defendant drove his pickup truck into an intersection at nearly 20 miles per hour, against a stop sign, and struck and killed a cyclist. For that conduct, the State of Oregon charged defendant with one count of criminally negligent homicide. Defendant works as a special agent with the Drug Enforcement Administration. Because the killing happened while he was on duty conducting surveillance, defendant removed the criminal prosecution to federal court under 28 U.S.C. § 1442(a)(1). Defendant then moved to dismiss, arguing that he was immune from state criminal prosecution under the Supremacy Clause. The district court granted defendant's motion to dismiss, and the state now appeals.

The district court erred in granting defendant's motion to dismiss, for two reasons. First, the court failed to accept as true the factual allegations in the indictment and failed to view the record evidence in the light most favorable to the state. Second, the court erred in concluding that defendant was entitled to immunity because, in the court's view, defendant's conduct was objectively reasonable as a matter of law. But viewing the record evidence in the light most favorable to the state, defendant is not entitled to immunity as a matter of law because a rational trier of fact could conclude that defendant's conduct was not objectively reasonable in the circumstances.

2

This court should reverse the district court's order granting defendant's motion to dismiss on Supremacy Clause immunity grounds and remand for further proceedings.

## STATEMENT OF BAIL / DETENTION STATUS

Pursuant to Rule 28-2.4, Circuit Rules of the United States Court of Appeals for the Ninth Circuit, the state certifies that defendant is not in pretrial detention. The state also certifies that defendant posted $2,000 security in Marion County No. 23CR43209, a portion of which was returned when defendant removed the case to federal court.

## STATEMENT OF JURISDICTION

### A. District Court Jurisdiction

The district court had federal-question jurisdiction over this state criminal prosecution under 28 U.S.C. § 1442(a)(1).[1]

### B. Finality of Judgment and Appellate Court Jurisdiction

The district court granted defendant's motion to dismiss the prosecution under Federal Rule of Criminal Procedure 12(b) and entered a judgment of

---

[1] This court previously denied the state's petition for a writ of mandamus seeking to have the prosecution remanded to state court. This court concluded that the district court did not clearly err in allowing removal, because defendant alleged a "colorable" federal defense and, thus, the district court had jurisdiction under § 1442(a)(1). *See State of Oregon v. United States District Court for the District of Oregon, Eugene* at *2–*3 (24-161) (unpublished memo op) (so concluding).

dismissal on the ground that defendant "is entitled to federal immunity from the state charges[.]" (1-ER-13, ECF 55). This court has jurisdiction to review that final order under 28 U.S.C. § 1291.

## C. Date of Entry of Judgment and Timeliness of Notice of Appeal

The district court entered both the order and judgment of dismissal on January 2, 2025. (1-ER-2–13, ECF 55 (Opinion and Order); 1-ER-14, ECF 56 (Judgment)). The state filed its notice of appeal on January 22, 2025. (3-ER-422–24, ECF 57). Accordingly, the notice of appeal is timely under Federal Rule of Appellate Procedure 4(b)(1)(B)(1).

## ISSUES PRESENTED FOR REVIEW

The state appeals from the final order granting defendant's motion to dismiss this state criminal prosecution based on Supremacy Clause immunity.

1.     In ruling on defendant's motion to dismiss, did the district court view the evidence, and all reasonable inferences therefrom, in the light most favorable to the state?

2.     When so viewed, does the evidence in the record establish that defendant is entitled to immunity as a matter of law—that is, could a rational trier of fact conclude that defendant's conduct was not objectively reasonable in the circumstances?

4

## STATEMENT OF THE CASE

### A.    Nature of the Case

This is a state criminal prosecution in which the State of Oregon alleges

that defendant is guilty of one count of criminally negligent homicide under Or.

Rev. Stat. § 163.145.[2]  Defendant, a DEA agent, removed the prosecution to

federal court under 28 U.S.C. § 1442(a)(1).  Following an evidentiary hearing,

the district court granted defendant's motion to dismiss under Federal Rule of

Criminal Procedure 12(b), concluding that defendant, as a matter of law, was

immune from state criminal prosecution under the Supremacy Clause.  The

state now appeals the district court's order and judgment of dismissal.

### B.    Course of Proceedings and Disposition Below

On March 28, 2023, defendant was driving in a government-issued

pickup truck in Salem, Oregon, while participating in a multi-agency

surveillance operation.  While trying to regroup with his team, defendant struck

and killed a cyclist as he drove through a stop sign at nearly 20 miles per hour

in a residential neighborhood.  A Marion County grand jury returned an

---

[2]    Oregon law provides that "[a] person commits the crime of criminally negligent homicide when, with criminal negligence, the person causes the death of another person."  Or. Rev. Stat. § 163.145(1).  Criminally negligent homicide is a Class B felony, Or. Rev. Stat. § 163.145(2), and carries a maximum indeterminate sentence of 10 years' imprisonment.  Or. Rev. Stat. § 161.605(2).

indictment charging defendant with one count of criminally negligent homicide.

Following arraignment in state court, defendant filed a notice of removal in

federal court under 28 U.S.C. § 1442(a)(1), alleging that he was entitled to

remove the state criminal prosecution to federal court because he "has a

colorable defense under federal law, namely, that he is immune from

prosecution." (2-ER-21, ECF 1). The state opposed removal. (ECF 8).

Following an evidentiary hearing, the district court granted defendant's request

to remove the prosecution to federal court. (ECF 22).

After this court denied the state's petition for a writ of mandamus,

defendant filed a motion to dismiss under Federal Rule of Criminal Procedure

12(b), arguing that he was entitled to dismissal because he was immune from

prosecution under the Supremacy Clause. (ECF 37). The state argued in

response that defendant was not entitled to immunity because his conduct was

not objectively reasonable in the circumstances. (ECF 40). Following an

evidentiary hearing, the district court granted the motion, concluding that

defendant's conduct was "necessary and proper" in the circumstances and, thus,

he was entitled to immunity from state prosecution as a matter of law. (1-ER-

3–4, 13).

6

## STATEMENT OF FACTS

### A.    The March 28 Surveillance Operation

Defendant works as a special agent with the DEA, assigned to the Salem, Oregon field office.  (3-ER-293, 302).  On March 28, 2023, defendant was part of a surveillance operation in the Salem area.  (3-ER-310–11).  The surveillance operation was part of the DEA's ongoing "Operation Backsplash": "an operation led by the Salem task force, targeting a multinational drug trafficking organization."  (3-ER-311).  According to the DEA's operational plan for the day, the mission's "primary goal" was to coordinate a controlled buy of 1,000 fentanyl pills from a drug courier and then "identify the current courier's vehicle so a tracker can be placed on it at a later time."  (2-ER-28 (ECF 47 Ex. 1)).  The Special Agent in charge of the operation, Agent Wolters, testified that the goal was to "gather evidence on a new courier," "gather intelligence on what he was driving," and "locate his residence and stash locations and his patterns."  (3-ER-22).  No arrests were planned for the day, and the surveillance teams members did not consider making any arrests at any point during the operation.  (3-ER-228, 244, 272, 364).  Multiple agents testified that surveillance is both a common and necessary tool to detect and disrupt drug trafficking.  (*E.g.*, 3-ER-215)

7

The March 28 surveillance team comprised eight officers, including defendant, from both the DEA, the FBI and the Salem Police Department.  (2-ER-30, 3-ER-202).  All the officers traveled individually in unmarked vehicles.  (3-ER-363–64).  The team members communicated with each other during the operation through a push-to-talk app on their cellphones.  (3-ER-270, 276).  During a surveillance operation, officers rotate among themselves to avoid being seen by the target.  (3-ER-215).  Surveillance operations are fluid—a given officer's place among the other officers and in relation to the target will change over time in response to the conditions and the target's behavior.  (3-ER-215–16).  An officer who falls behind will work to catch up to the group.  (3-ER-229, 241).  Although some suspected drug traffickers drive normally, others employ countersurveillance measures, such as erratic driving maneuvers, to avoid surveillance.  (3-ER-215, 302–03).  And many are armed.  (3-ER-303).  It is therefore important for all team members to stay undetected and available to rotate into and out of position during a surveillance operation.  (3-ER-303–04).

**B.      While trying to regroup with the surveillance team, defendant strikes and kills the victim as he drives through an intersection on a residential street.**

March 28, 2023, was a typical spring day in Western Oregon—cloudy and rainy.  (3-ER-225, 248).  The surveillance operation took place in the early afternoon in daylight hours.  (3-ER-225).

The first part of the operation went as planned: the suspected courier brought 1,000 fentanyl pills to a confidential buyer, made the sale, and departed the scene.  (3-ER-226).  The surveillance team followed the courier as he drove north to Keizer, met with an unknown individual, and drove back south to Salem.  (3-ER-226).  The courier sat in his vehicle in a strip mall and then began traveling northbound on Liberty Street.  (3-ER-230).  As the courier drove northbound on Liberty, Agent Hoagland was in the "eye" position—that is, he was first in line behind the courier.  (3-ER-231, 252).  Agent Hoagland informed the other team members that the courier made a right turn from Liberty onto eastbound Mission Street.  (3-ER-231).  The target "cut across" one or two lanes to make the turn as the light was turning yellow.  (3-ER-253).  Agent Hoagland was unable to follow the target without revealing himself, so he continued traveling northbound on Liberty.  (3-ER-253).  Agent Hoagland heard another team member confirm that they made the turn and took up the "eye" position.  (3-ER-254–55).  Indeed, Officer Zuniga made the turn onto

Mission Street and took up the "eye" position behind the target, followed by Sergeant Dawson. (3-ER-234–35, 283, 364).

As noted, Agent Hoagland continued straight on Liberty through Mission Street. (3-ER-253). He turned right at the first opportunity onto Leslie Street and then turned southbound onto High Street, which leads back to Mission Street. (3-ER-253–54; 2-ER-175 (ECF 47 Ex. 7)). As Agent Hoagland approached High Street, he slowed down at the stop sign but did not make a complete stop before turning. (3-ER-257).

Like Agent Hoagland, both Agent Otte and defendant continued straight through Mission Street after the subject turned onto Mission from Liberty. Defendant was driving behind Agent Otte. (3-ER-231). Agent Otte was unable to merge to the right lane in time to make the turn onto Mission Street. (3-ER-232). As he went straight through Mission Street, Agent Otte saw defendant follow behind him. (3-ER-234). Agent Otte eventually turned right onto Oak Street, one block past Leslie Street. (3-ER-235–36). Defendant, meanwhile, turned right onto Leslie Street as Agent Hoagland had done. (3-ER-326). Agent Otte turned south onto High Street and, as he approached the intersection with Leslie, saw the scene of the crash. (3-ER-236–37).

A map view of the pertinent area is provided below, with an X showing the location of the collision:



(2-ER-175 (ECF 47 Ex. 7)).

Leslie Street is a "very narrow" residential street. (3-ER-266). Cars are parked on both sides of the street, leaving "less than one open lane" of travel. (3-ER-266). Because it is a residential street, the speed limit on Leslie is 25 miles per hour. (3-ER-394). Approaching the intersection with High Street, it is difficult to see to the north due to a retaining wall and shrubbery. (3-ER-267). In fact, a driver is unable to safely pull onto High Street without stopping at the stop bar and creeping forward to see around the visual obstruction. (3-ER-383). Traffic on High Street has the right of way at the intersection without

a stop sign, while traffic on Leslie has a stop sign. (3-ER-383). High Street runs down a hill to the intersection with Leslie. (3-ER-354, 374).

Officer Powell, an accident reconstructionist, later determined based on security camera footage that defendant was traveling down Leslie at a "noticeably higher speed" than other vehicles. (3-ER-387). Using video camera footage, still photographs, and measurements of defendant's truck, Officer Powell calculated that defendant drove the single block of Leslie Street between Liberty and High at a minimum average speed of 32 miles per hour and a maximum speed of 37 miles per hour. (3-ER-389). Officer Powell also determined, based on a later examination of the truck, that the truck's "A-pillar" would not have obstructed the driver's view onto High Street within the intersection, because traffic on High Street at the intersection would be visible directly out of the driver's side window. (3-ER-393). Finally, Officer Powell calculated that defendant entered the intersection at a minimum of 18 miles per hour. (3-ER-393–94).

Defendant felt something collide with the driver's side of his vehicle as he entered the intersection. (3-ER-333). Defendant pulled over and got out of his truck, saw the victim in the street, and radioed for help. (3-ER-333). Defendant was in shock and tried to get the victim's attention. (3-ER-333). She was unresponsive. (3-ER-239). Medical personnel arrived within a few

minutes and transported the victim to the hospital, where she died.  (3-ER-239, 185, 361; 2-ER-74 (ECF 47 Ex. 3)).

A resident who lived on the southeast corner of High and Leslie recalled seeing the victim riding her bicycle on High Street to and from work on several occasions.  (3-ER-341–42).  On the day she was killed, the victim was wearing bright green clothing and a helmet and riding a bicycle equipped with flashing lights.  (3-ER-386).

**C.  DEA policy allows agents to violate traffic laws only in certain emergency or enforcement situations.**

DEA policy governs the use of official government vehicles by DEA personnel.  (2-ER-37–41 (ECF 47 Ex. 2)).  The policy covers topics such as procurement, vehicle assignment, maintenance, and—pertinent here—safe operation.  (2-ER-39–41, § 6124.5).  As a baseline, the DEA policy provides that "[a]ll employees are expected to drive in a defensive manner and obey all traffic laws."  (2-ER-39, § 6124.5(B)).  But "[i]n certain enforcement and emergency situations, agents may have to violate traffic or parking laws."  In that circumstance, "the safety of the public and the agent have higher priority than any enforcement activity."  And "[t]raffic and parking laws will not be violated to the detriment of public and personal safety."  (2-ER-39, § 6124.5(D)).

The policy offers a more detailed set of restrictions, and considerations, when an agent engages in "emergency driving" or a "high-speed pursuit." Such driving "occurs when posted speed limits are exceeded and/or other traffic laws are justifiably violated. Except in extraordinary circumstances (i.e., the life of an agent or another person is at stake), high-speed pursuits of fleeing suspects or high-speed emergency responses are expressly prohibited." (2-ER-39, § 6124.5(F)). If an "extraordinary emergency circumstance" requires high-speed pursuit or emergency driving, an agent must consider several variables prior to and during the pursuit or response, including the severity of the offense or emergency situation, whether the suspect can be apprehended at a later time, weather and road conditions, the volume of vehicular and pedestrian traffic, the time of day, the capabilities of the vehicle, whether the vehicle has emergency lights and sirens, and the availability of uniformed officers to assist with the pursuit. (2-ER-39–40, § 6124.5(F)(1)–(8)).

Finally, if an agent uses lights and sirens during a high-speed pursuit or emergency response, the agent must do so in accordance with applicable state and local laws. (2-ER-41, § 6124.5(M)). Oregon law provides that the driver of an emergency vehicle may disregard certain traffic laws and may proceed past a red signal or stop sign. Or. Rev. Stat. § 820.300(1)(b). But that provision does not relieve the driver of an emergency vehicle "from the duty to

drive with due regard for the safety of all other persons" and is not a defense "in an action brought for criminal negligence or reckless conduct." Or. Rev. Stat. § 820.300(2)(a), (b).

**D.    Defendant and other officers testified to the grand jury; defendant explained that he was driving with a sense of purpose but without urgency.**

During his grand jury testimony, Sergeant Dawson testified that the March 28 surveillance operation did not present an immediate danger to life and did not involve a pursuit.  (2-ER-78–79).  At the time of the crash, there was no danger of losing the suspect.  (2-ER-83).  Agent Otte testified that all the surveillance team members were in communication using a group chat feature on their cellphones.  (2-ER-91).  Like Sergeant Dawson, Agent Otte testified that "there was nothing urgent that day."  (2-ER-92).  And like Sergeant Dawson, Agent Otte testified that there was no discussion of losing the suspect. (2-ER-92).  As for whether agents follow traffic laws during surveillance operations, Agent Otte testified, "We follow traffic laws.  When it's safe to proceed, we proceed.  If that means violating a traffic law, that's normal course of our business."  (2-ER-99).

Agent Hoagland testified that all DEA agents are trained to utilize spatial awareness when driving.  (2-ER-102).  He also testified that, on March 28, there were no plans to seize drugs, no planned arrests, and no pursuits.  (2-ER-102–

03). The suspect was driving erratically, which meant that there were "a few times that [agents] needed to go above the speed limit to be able to keep up with him." (2-ER-103). Throughout the surveillance operation, the team always had eyes on the subject and were in communication with push-to-talk cellphones. (2-ER-103–04). Agent Hoagland, who turned off of Leslie onto High Street before defendant reached the intersection, testified that Leslie is "very narrow" and it is "a difficult intersection" due to the "big slope to the north" and poor visibility. (2-ER-105). Agent Hoagland testified that, as he waited at the light on High Street to turn east onto Mission, he saw defendant in his rearview mirror "completely stop at the intersection" of Leslie and High. (2-ER-106). Then, as his light turned green, Agent Hoagland heard a collision. (2-ER-106). Agent Hoagland testified that he sped on Leslie because he needed to catch back up with the team. (2-ER-109).

Like Dawson, Otte, and Hoagland, Officer McCarley testified that the investigation on March 28 was not urgent or emergent. (2-ER-113). And like Agent Hoagland, he testified that the surveillance team members sometimes need to exceed the speed limit to stay with a subject. (2-ER-113). Officer McCarley recalled that that some of the team members were unable to follow the subject as he turned onto Mission, but they knew where the subject was. (2-ER-116).

Agent Thomas told the grand jury about the dynamics of the surveillance operation. He explained that the operation carried a "basic level of urgency" in that, should one of the agents fall behind, it may "take a while to get caught up and be able to provide some value to the surveillance." (2-ER-125–26). But the operation "had enough people there that there wasn't an urgency of losing this person or anything like that." (2-ER-126). Agent Thomas had received some training in "[h]igh speed" driving but explained that "that's not the focus of what we do." (2-ER-126).

At the time of the collision, Detective Zuniga had eyes on the subject. (2-ER-133). During surveillance operations, officers and agents must handle multiple requirements at the same time—surveilling a subject, working one or more phones, and staying aware of surroundings. (2-ER-136–37). If a subject spots the surveillance, they may attempt to elude officers. (2-ER-137). During surveillance an agent must employ a heightened sense of awareness of their surroundings, especially in an area with which they are unfamiliar. (2-ER-137).

Finally, defendant testified to the grand jury. (2-ER-145). He explained that he had been employed with the DEA for seven and a half years. (2-ER-146). He works as part of a team investigating a drug-trafficking organization based in Mexico responsible for smuggling large quantities of heroin, methamphetamine, and fentanyl across the southern border and up the I-5

corridor. (2-ER-147). The team is particularly focused on disrupting the distribution of fentanyl. (2-ER-147). On March 28, 2023, the goal was to identify a drug courier and follow that person to their residence, allowing agents to further surveil and ultimately arrest individuals involved in the trafficking organization. (2-ER-148). The team members communicated via private push-to-talk technology. (2-ER-148–49). Defendant has received training in both surveillance and driving techniques. (2-ER-149). Defendant testified that there was no urgency to the operation that day. (2-ER-150). He knew that some officers were ahead of him and closer to the subject, but he also knew that he needed to catch back up to his team, so he was "driving with a purpose." (2-ER-150). A surveillance team of three or four is usually insufficient to tail a subject effectively—thus, although defendant knew that some officers had followed the subject, he also "needed to find my bearings and catch up to my team to help them follow and identify this person." (2-ER-151). Defendant did not recall previously driving in the area of the crash and remembered that it was raining. (2-ER-152). He estimated that he drove down Leslie Street at 25 to 35 miles per hour. (2-ER-152). Defendant recalled driving down Leslie and braking as he approached the intersection with High Street. Defendant recalled: "I want to say that I came to a stop but I don't recall if I did or not." He did not recall seeing anyone or any vehicles that "would cause conflict if I were to enter

the intersection." (2-ER-153). Defendant also remembered an obstruction blocking the view up the hill on High Street. (2-ER-154). Defendant later clarified that he remembered "slowing down greatly—safely enough to enter the intersection." But he could not recall if he came to a complete stop. (2-ER-154).

## SUMMARY OF ARGUMENT

The district court committed two errors in granting defendant's motion to dismiss based on Supremacy Clause immunity, the first of which led directly to the second. First, the district court failed to account for the allegations in the indictment and failed to view the evidence in the record, and all reasonable inferences therefrom, in the light most favorable to the state. Indeed, the district court variously stated that there were "no disputes of any material fact" regarding defendant's claim of immunity and failed to view the evidence in the record in the light most favorable to the state. That was error. Second, the court concluded that defendant was entitled to immunity because his conduct was "necessary and proper" as a matter of law. In other words, the court determined that no rational trier of fact could conclude, based on the evidence, that defendant's conduct was *not* objectively reasonable in the circumstances. But, as noted, the court failed to view the evidence in the light most favorable to the state. And that failure led directly to the court's erroneous legal ruling.

Instead, the evidence in the record—when properly viewed in the light most favorable to the state—would permit a rational trier of fact to conclude that defendant's conduct was not objectively reasonable in the circumstances.  The district court thus erred in granting defendant's pretrial motion to dismiss on Supremacy Clause grounds.

## STANDARD OF REVIEW

This court must decide whether the district court correctly granted defendant's Rule 12(b) motion to dismiss the state's indictment.  *See* Fed. R. Crim. P. 12(b) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."); *see also* Fed. R. Crim. P. 12(b) advisory committee's note (explaining that "immunity" is a Rule 12(b) defense); *Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988) (holding that defense of federal immunity is properly raised in a Rule 12(b) motion).  Because resolution of defendant's motion to dismiss involves mixed questions of law and fact, this court must decide *de novo* whether defendant qualifies for federal immunity under the Supremacy Clause.  *See Wyoming v. Livingston*, 443 F.3d 1211, 1226 (10th Cir. 2006) (applying that standard); *New York v. Tanella*, 374 F.3d 141, 146 (2d Cir. 2004) (same).

In conducting *de novo* review of defendant's claim of immunity, two further principles guide this court's consideration of the record evidence.  First,

because defendant raised his immunity defense in a pretrial motion to dismiss, this court must assume the truth of all allegations in the indictment. *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952) (describing the "familiar rule" that, in deciding a pretrial motion to dismiss, "the allegations of the indictment must be taken as true"). Second, this court must view the evidence in the light most favorable to the state, as the non-moving party. *Livingston*, 443 F.3d at 1226 (citing *Tanella*, 374 F.3d at 148).

In sum, after accepting all allegations in the indictment as true and viewing the record evidence in the light most favorable to the state, this court should conclude that defendant is entitled to immunity only if the facts supporting his claim of immunity are undisputed and, based on those facts, defendant is entitled to immunity as a matter of law. *Long*, 837 F.2d at 752 (holding that court should not grant motion where evidence "raise[s] a genuine factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do" (emphasis omitted)); *cf. Morgan v. California*, 743 F.2d 728, 732 (9th Cir. 1984) ("a grant of a writ of habeas corpus prior to a state criminal trial

21

is inappropriate when there are material factual disputes" regarding the claim of

Supremacy Clause immunity).[3]

---

[3]    In *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir.) (en banc), *vac'd as moot*, 266 F.3d 979 (9th Cir. 2001) (en banc), a plurality appeared to suggest a different standard than the one applied in *Livingston* and *Tanella*, at least when the district court holds an evidentiary hearing. In *Horiuchi*, the district court dismissed a state murder prosecution on Supremacy Clause grounds without holding an evidentiary hearing. 253 F.3d at 367. Six judges voted to reverse, agreeing that there were disputed questions of material fact that, if resolved against the defendant, would strip him of immunity. *Id.* at 374 (Kozinski, J.) (so concluding); *see also id.* at 378 (Fletcher, J., concurring and dissenting) (concurring with that conclusion). Judge Kozinski, joined by three other judges, further explained that, on remand, any factual disputes regarding the defendant's immunity would need to be resolved by the district court, not the jury, assuming that the defendant renewed his motion to dismiss during trial. *Id.* at 374. Judge Fletcher and Judge Thomas dissented from that portion of Judge Kozinski's opinion, arguing that factual questions regarding a defendant's claim of immunity must be decided by a jury. *Id.* at 378 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

The plurality's rule might suggest that the standard of review should be clear error *if* the trial court held an evidentiary hearing. *See United States v. Cloud*, 102 F.4th 968, 975 (9th Cir. 2024) (adopting clear error rule for review of district court's factual findings in context of *Brady* challenge). But this Court should decline to apply that standard here. First, that portion of Judge Kozinski's opinion failed to garner a majority of the en banc court and, in any event, was later vacated as moot. Second, although the district court in this case held an evidentiary hearing, the court did not purport to make any factual findings or resolve any disputed issues of fact. Instead, the court stated that "there are no disputes of any material fact" and proceeded to decide whether defendant was entitled to immunity as a matter of law. (1-ER-3). Thus, this Court should adopt the standard of review applied in *Livingston* and *Tanella* and decide *de novo* whether defendant is entitled to immunity.

## ARGUMENT

**A.    A federal officer is entitled to immunity from state criminal prosecution only when the officer's conduct is both authorized by federal law and objectively reasonable in the circumstances.**

This case raises the "seldom-litigated" issue of Supremacy Clause immunity of federal officers.  *Livingston*, 443 F.3d at 1213.  The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The Supreme Court has long understood the Supremacy Clause to prohibit the states from interfering with the conduct of federal executive officials when they are carrying out federal laws.  *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) (explaining that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government"); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 865–66 (1824) (immunity for federal officials "is implied in the several acts by which these [federal] institutions are created, and is secured to the individuals employed in them").

The leading case defining the contours of Supremacy Clause immunity is *In re Neagle*, in which the Court adopted a two-part test for determining when the Supremacy Clause immunizes the conduct of federal officials.  135 U.S. 1 (1890).  First, the prosecution must be for an act that the federal officer "was authorized to do by the law of the United States, which it was his duty to do as [an officer] of the United States."  *Id.* at 75.  Second, to claim immunity, the officer must have done "no more than what was necessary and proper for him to do[.]"  *Id.*  Applying that test, the Court concluded that a deputy marshal was immune from a state murder prosecution when he killed a man whom the marshal thought was about to murder Justice Field.  The Court held that the marshal's conduct was necessary and proper because his belief that Justice Field's life was in danger was "well-founded" and, thus, the use of lethal force was "justified."  *Id.* at 76.  And, because his conduct was necessary and proper, he was "not liable to answer in the courts of California" for his conduct.  *Id.*

In later cases, the Court continued to analyze the "necessary and proper" requirement by reference to the reasonableness of the official's conduct in carrying out federal duties.  *See Ohio v. Thomas*, 173 U.S. 276, 282 (1899) (holding that governor of federal asylum was immune from state prosecution for failing to display sign stating that facility was serving "oleomargarine," because the defendant provided food to residents of the asylum consistent with

the directions of the board of managers and act of Congress). But in cases presenting conflicting evidence about whether a federal official's conduct was reasonable, the Court declined to find that the official was entitled to immunity. For example, in *United States ex rel. Drury v. Lewis*, Pennsylvania charged two soldiers with murdering a civilian whom they suspected of attempting to steal from a federal arsenal. 200 U.S. 1, 2 (1906). The defendants claimed that the shooting was lawful because the suspect was fleeing from arrest, but witnesses testified that the defendants shot the suspect after he surrendered. *Id.* at 3–4. The Court affirmed the lower federal court's refusal to grant a writ of habeas corpus, given the conflicting evidence about whether the killing was lawful. *Id.* at 7–8. In reaching that conclusion, the Court described the delicate balance between protecting a federal officer's ability to carry out federal duties free from state interference or harassment, on the one hand, and a state's important interest in prosecuting violations of its peace and dignity, on the other. Thus, "[i]t is an exceedingly delicate jurisdiction given to the Federal courts by which a person under an indictment in state court, and subject to its laws, may, by the decision of a single judge of the Federal court, upon a writ of habeas corpus, be taken out of the custody of the officers of the state, and finally discharged therefrom, and thus a trial by the state courts of an indictment found under the laws of a state be finally prevented." *Id.* at 7.

In more recent cases, this Court has further clarified what it means for a federal officer's conduct to be "necessary and proper." Resolution of the "necessary and proper" prong of *Neagle* "rest[s] not only on the subjective belief of the officer but also on the objective finding that his conduct may said to be reasonable under the existing circumstances." *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977). As the Tenth Circuit explained, "a federal officer is not entitled to Supremacy Clause immunity unless, in the course of performing an act which he is authorized to do under federal law, the agent had an objectively reasonable and well-founded basis to believe that his actions were necessary to fulfill his duties." *Livingston*, 443 F.3d at 1222. Put another way, "a state may prosecute federal agents if they have acted unlawfully in carrying out their duties." *Idaho v. Horiuchi*, 253 F.3d 359, 366 (9th Cir.) (en banc), *vac'd as moot*, 266 F.3d 979 (9th Cir. 2001) (en banc).

In this case, the district court concluded that defendant satisfied the first prong of *Neagle*—*viz.*, the state prosecution arose from an act which defendant "was authorized to do by the law of the United States, which it was his duty to do as [an officer] of the United States." 135 U.S. at 75; (1-ER-3). The state has never argued otherwise. Instead, the issue is whether the record evidence, viewed in the light most favorable to the state, establishes that defendant's

conduct was objectively reasonable in the circumstances. The district court erroneously answered that question in the affirmative.

**B.  The district court failed to account for the allegations in the indictment and failed to view the record evidence in the light most favorable to the state.**

### 1.  The district court was required to accept as true the state's allegation that defendant was criminally negligent.

As set out above, the first principle that should have guided the district court's consideration of defendant's motion to dismiss is the "familiar rule" that, in ruling on a pretrial motion to dismiss, the court must accept the allegations in the indictment as true. *Boyce Motor Lines, Inc.*, 342 U.S. at 343 n.16. On September 6, 2023, the grand jury issued an indictment charging defendant with one count of criminally negligent homicide under Or. Rev. Stat. § 163.145. (2-ER-26 (ECF 1 Ex. B)). The indictment alleged that "defendant, on or about March 28, 2023, in Marion County, Oregon, did unlawfully and with criminal negligence cause the death of [the victim], another human being." *Id.* Oregon law defines "criminal negligence" to mean "that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Or. Rev. Stat. § 161.085(10).

27

Thus, for purposes of deciding defendant's claim of immunity on a pretrial motion to dismiss, the district court was required to accept as true the allegations that (1) defendant failed to be aware of a substantial and unjustifiable risk that his conduct would cause the death of another person, and (2) his failure to be aware of that risk constituted a gross deviation from the standard of care that a reasonable person would observe in defendant's situation. But the district court's analysis demonstrates that it either ignored or discounted the factual allegations in the indictment. For example, the court observed that defendant was "negligent" but "acted with no malice or ill intent in colliding with" the victim. (1-ER-3). But Oregon does not define criminal negligence by reference to a defendant's malice or ill intent. And at this stage of the litigation, it must be taken as true that defendant was *criminally* negligent, not simply negligent—that is, his failure to be aware of a substantial and unjustifiable risk that his conduct would cause the death of another person constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. *See State v. Lewis*, 290 P.3d 288, 293 (Or. 2012) (observing that, "[o]n the spectrum of mental states, criminal negligence falls between negligence and recklessness" because it requires proof that a person's failure to be aware of a substantial and unjustifiable risk qualifies as a gross deviation from the standard of care that a reasonable person would

observe in the situation but does not require proof that the person was aware of and consciously disregarded such a risk).

### 2. The district court improperly viewed the record evidence in the light most favorable to defendant's claim of immunity.

Next, the district court was required to view the evidence in the record in the light most favorable to the state as the non-moving party. *See Livingston*, 443 F.3d at 1226 (citing *Tanella*, 374 F.3d at 148) (applying that standard). But the district court failed to do that. Four aspects of the court's opinion exemplify the court's failure to properly view the record evidence in the light most favorable to the state.

*First*, the court stated that the record contained "undisputed evidence * * * that [defendant] subjectively believed it was necessary to run the stop sign to catch up with 'the eye' of the surveillance team." (1-ER-5). The record does not support that recitation. At the evidentiary hearing, defendant testified that he believed it was necessary for him to regroup with the team "as quickly as I possibly could." (3-ER-324). He earlier testified that, at times, he has exceeded posted speed limits, turned without signaling, and passed through red lights and stop signs without coming to a complete stop. (3-ER-305). But nowhere in defendant's testimony did he state that he subjectively believed that he needed to drive through the stop sign on High Street at nearly 20 miles per hour to catch up with his team. In fact, defendant indicated the opposite in his

testimony to the grand jury.  Defendant testified that, after he fell out of

rotation, he was "driving with a purpose" to regroup with the team.  (2-ER-

150).  But instead of testifying that he needed to drive through the intersection

at 18 miles per hour, defendant recalled braking as he neared the intersection

and even stated that he thought that he "came to a stop but I don't recall if I did

or not."  (2-ER-153).  Defendant later clarified that he "slow[ed] down

greatly—safely enough to enter the intersection," but could not recall whether

he came to a complete stop.  (2-ER-154).  Viewed in the light most favorable to

the state, the record evidence does not support the district court's conclusion

that defendant subjectively believed it was necessary to run the stop sign to

regroup with his team.  Defendant certainly subjectively believed that he

needed to regroup with his team, but it does not necessarily follow that

defendant subjectively believed that he needed to drive through the stop sign at

18 miles per hour—the pertinent question in this case.

*Second*, the district court stated that agents who are involved in

surveillance operations "must often break traffic laws."  (1-ER-6).  But that is

an oversimplification of the record evidence.  There is no dispute that

surveillance operations are fluid, that the subjects of surveillance often employ

countersurveillance measures, and that surveillance team members need to stay

undetected and rotate into and out of position.  (3-ER-302–04).  As for the need

to break traffic laws, various witnesses certainly testified that agents sometimes need to break traffic laws while conducting surveillance. (3-ER-196, 217, 219, 258). But that testimony was couched in general terms. For example, Agent Hoagland testified that, during the operation on March 28, 2023, he needed to speed "in order to stay caught up with the target vehicle, who was also speeding throughout the day." (3-ER-257–58). But Agent Thomas testified that a surveillance operation needs many agents because they "never know when [a subject is] going to make an unexpected turn or, you know, violate traffic law and do something that standard traffic couldn't follow. So we need to have other people in the area that can immediately move in and take the eye and stay with the target." (3-ER-277). Viewed in the light most favorable to the state, that evidence suggests that there is a limit to the nature of the traffic violation that a DEA agent may be expected to perform during a surveillance operation. Speeding to stay with a suspect may be one thing, but performing an unexpected violation "that standard traffic couldn't follow" may not only be dangerous but also detrimental to the mission if it risks exposing an agent's presence. Indeed, the more agents involved in a surveillance operation the less likely it is that any of them will be detected. (3-ER-303). In sum, the record evidence, viewed in the light most favorable to the state, does not support the

district court's simple assertion that agents must "often break traffic laws" to carry out successfully a surveillance operation.

*Third*, the district court appeared to ignore entirely the DEA policy on the use of government vehicles, except for its statement that defendant's conduct appeared consistent with that policy. (1-ER-9). Had the district court viewed the policy in the light most favorable to the state, however, the court could not have made that conclusion. As noted, the DEA policy provides that, "[i]n certain enforcement and emergency situations, agents may have to violate traffic or parking laws." In that circumstance, "the safety of the public and the agent have higher priority than any enforcement activity." And "[t]raffic and parking laws will not be violated to the detriment of public and personal safety." (2-ER-39, § 6124.5(D)). The policy goes on to provide a detailed set of restrictions and considerations when an agent engages in "emergency driving" or a "high-speed pursuit." Such driving "occurs when posted speed limits are exceeded and/or other traffic laws are justifiably violated." And "[e]xcept in extraordinary circumstances (i.e., the life of an agent or another person is at stake), high-speed pursuits of fleeing suspects or high-speed emergency responses are expressly prohibited." (2-ER-39, § 6124.5(F)). In this case, no witness stated that the surveillance operation involved emergency

driving or a high-speed pursuit.[4]  Rather, the witnesses uniformly denied that the operation involved an emergency or exigency.

Because the March 28 surveillance operation did not involve an emergency or high-speed pursuit, defendant was permitted "to violate traffic or parking laws" only under the express proviso that "the safety of the public and the agent have higher priority than any enforcement activity"—that is, under the policy, the safety of the public outweighed defendant's need to regroup with his team.  If defendant could not violate a traffic law without endangering public safety, then defendant was not permitted to take that action.  Indeed, "[t]raffic and parking laws will not be violated to the detriment of public and personal safety."  (2-ER-39, § 6124.5(D)).  Viewed in the light most favorable to the state, then, the district court could not conclude that defendant's conduct was consistent with DEA policy governing the use of vehicles during enforcement operations.  To the contrary, defendant exceeded the scope of his authority granted by the DEA policy to violate state traffic laws.

*Finally*, the district court placed an undue amount of weight on the fact that "the DEA is currently engaged in a longstanding battle against Mexican

---

[4]    Nor, for that matter, did any witness clearly testify that a routine surveillance operation with no plans for arrest qualifies as an "enforcement situation" in which an agent is permitted to violate traffic laws under § 6124.5(D).

cartels flooding the United States with fentanyl" and long-term surveillance operations are an important tool in that battle. (1-ER-6). But the question for the district court to decide was not whether the DEA's ongoing mission of combatting the distribution of fentanyl is an important one—the state readily concedes that it is. Nor is the question whether surveillance operations are an important part of that mission—again, the state does not dispute that point. The pertinent question is whether defendant's specific conduct of disregarding the right-of-way rules and driving through a stop sign at 18 miles per hour on a narrow residential street, while trying to regroup with his team (some of whom had eyes on the subject), was objectively reasonable in the circumstances. The importance of the DEA's efforts to combat fentanyl distribution adds little, if anything, to that analysis. This might be a different case if defendant had been driving in hot pursuit, responding to reports of shots fired, or responding to some other emergency. But he was not. And the importance of defendant's job or his mission does not imbue his conduct with an added layer of reasonableness that some other federal agent may not enjoy. After all, surveillance may be an important tool, but it is also routine. (3-ER-196).

In sum, the district erred in failing to view the record evidence in the light most favorable to the state. As explained below, when so viewed, the

record would permit a rational factfinder to conclude that defendant's conduct was not objectively reasonable in the circumstances.

## C. The district court erred in granting defendant's motion to dismiss because a rational factfinder could conclude that defendant's conduct was not objectively reasonable in the circumstances.

After accepting all allegations in the indictment as true and viewing the record evidence in the light most favorable to the state, defendant is entitled to immunity only if the facts supporting his claim of immunity are undisputed and, based on those facts, defendant is entitled to immunity as a matter of law. *Long*, 837 F.2d at 752 (holding that court should not grant motion to dismiss where evidence "raise[s] a genuine factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do" (emphasis omitted)). The district court erroneously answered that legal question in the affirmative.

When a federal officer claims immunity from charges arising out of an on-duty vehicle crash, as defendant does here, the officer must show that they had an objectively reasonable basis to believe that the action that led to the crash was necessary to fulfill the officer's federal duties. This Court's prior cases, along with decisions by other circuits, show that, as a general matter, an action that violates the rules of the road will be "necessary"—and thus

objectively reasonable—only when there is some exigency that requires the officer to violate the law.

For example, in *California v. Mesa*, this Court held that two Postal Service mail carriers who were being prosecuted for crashes they caused while on duty could not rely on Supremacy Clause immunity to remove their prosecutions to federal court. 813 F.2d 960 (9th Cir. 1987), *aff'd*, 489 U.S. 121 (1989). One case involved a mail carrier who, while allegedly making an illegal left-hand turn from the middle lane of traffic, struck and killed a boy who was cycling. *Id.* at 969 (Noonan, J., dissenting) (explaining facts). The other received a traffic ticket for speeding and failing to yield after colliding with a police car. *Id.* at 961 n.2. Both defendants were on duty as federal employees and had jobs that required them to drive to carry out their duties. *See id.* at 965 (noting allegations in removal petitions). And yet neither was entitled to Supremacy Clause immunity, because their federal duties did not *require* them to make an illegal left-hand turn or speed. *Id.* ("Neither petition shows a sufficient 'causal connection' between their duties as mail carriers and the allegedly negligent driving upon which their prosecutions rest."). This Court explained that "[t]here is no colorable claim that federal immunity" applied to the actions that led to the crashes, contrasting them with a case in which "a federal officer received a speeding ticket while hurrying to stage a raid

on a suspected illegal still."[5]  *Id.* (citing *City of Norfolk v. McFarland*, 143

F. Supp. 587 (E.D. Va. 1956)).  *Mesa* thus supports the conclusion that a federal

officer who violates state traffic laws is entitled to immunity only if some duty-

related exigency requires the officer to do so—whether they are a mail carrier

or a law enforcement officer.  That is, it may be difficult to imagine a scenario

in which a mail carrier must violate state traffic laws to carry out their federal

duties, but it does not follow that any violation of state traffic law by a federal

law enforcement officer is necessary and reasonable.

On that point, the most complete articulation of the standard for vehicle

crashes comes from the Fourth Circuit's decision in *North Carolina v. Cisneros*,

947 F.2d 1135 (4th Cir. 1991).  The Fourth Circuit explained that to establish

federal removal jurisdiction based on "an on-duty vehicular traffic accident, a

federal officer must show that the accident resulted from an exigency or

emergency related to his federal duties which dictated or constrained the way in

which he was required to, or could, carry out those duties."  *Id.* at 1139.  Thus,

---

[5]     In *Mesa* this Court concluded, and the Supreme Court agreed, that the federal court lacked jurisdiction over the state criminal prosecutions, under 28 U.S.C. § 1442(a)(1), because the defendants failed to allege a colorable federal defense to the state charges.  Here, of course, this Court already determined that the district court had jurisdiction because defendant alleged a colorable claim of Supremacy Clause immunity.  But this Court's discussion in *Mesa* of the "necessary and proper" prong of Supremacy Clause immunity is nevertheless instructive.

for example, an officer would have a colorable claim of immunity if the officer had to "exceed a speed limit in order to capture a fleeing felon, or to execute a raid," or to "use a known defective vehicle to complete emergency snow clearing[.]" *Id.* But there would be no immunity, for example, for an officer who "mistakenly thought that he safely could enter an intersection while in convoy, being under no duty-related exigency or emergency requiring him to do so[.]" *Id.*; *see also id.* at 1140 (no immunity for crash caused by failed brakes where there was no evidence that the defendant's superiors thought that, even though the brakes were known to be defective, "vital federal interests required that the truck should nevertheless be used" to carry out the duty at issue).

Finally, although it did not involve a vehicle crash, this Court applied similar principles in *Morgan v. California*, which involved a DEA agent who allegedly tried to park his car while intoxicated and was charged in state court with driving under the influence. 743 F.2d 728 (9th Cir. 1984). The agent asserted that he was immune from prosecution because he was on his way to meet with an informant. *Id.* at 733. This Court rejected that argument, explaining that the agent "has not demonstrated how it would be necessary and proper for him to drive while under the influence in order to carry out his federal duty of meeting with an informant." *Id. Morgan* thus confirms that federal officers have immunity for their conduct in driving a vehicle only when

they reasonably believe that some duty-related exigency required them to violate state traffic laws.

Applying the foregoing principles to this case demonstrates that the district court erred in concluding that defendant was entitled to immunity as a matter of law. As already set out above, the district court failed to account for the fact that, at this stage in the litigation, defendant's conduct was criminally negligent—that is, defendant failed to be aware of a substantial and unjustifiable risk that his conduct would cause the death of another person, and that failure was a gross deviation from the standard of care that a reasonable person would observe in the situation. Moreover, as set out above, the district court failed to view the evidence in the light most favorable to the state.

Turning to the court's legal ruling, the district court concluded that defendant was entitled to Supremacy Clause immunity as a matter of law. Or, in other words, the district court determined that no rational trier of fact could conclude that defendant's conduct was *not* objectively reasonable in the circumstances. That was error. Instead, a rational trier of fact could conclude that defendant's conduct was not objectively reasonable in the circumstances, considering the allegations in the indictment and when viewing the evidence in the record in the light most favorable to the state. *See, e.g.*, *Torres v. City of Madera*, 648 F.3d 1119, 1125–26 (9th Cir. 2011) (explaining that district court

erred in determining that the defendants in civil excessive-force case were entitled to summary judgment because "a reasonable jury could weigh the significance of [the evidence] differently from the way in which the district court weighed" that evidence).

The following points, considered holistically, would permit a rational trier of fact to conclude that defendant's conduct was not objectively reasonable in the circumstances:

- Defendant was one member of a surveillance team of approximately eight agents and police officers.

- There were no plans on March 28 to arrest the subject or otherwise disrupt the distribution of fentanyl.

- Surveillance operations are an important and common tool in the DEA's efforts to disrupt the distribution of fentanyl.

- The goal was to locate the courier's residence so that agents could later place a tracking device on the courier's vehicle.

- All the team members were in communication via push-to-talk app on their cellphones.

- The weather on March 28 was rainy and the streets were wet.

- At no point during the operation was there an emergency or high-speed pursuit.

- The agents successfully observed a controlled buy of 1,000 fentanyl pills.

- After the controlled buy, the subject made a sudden turn from Liberty Street onto Mission Street.

- Defendant and two other agents, Hoagland and Otte, were unable to follow the subject after he turned onto Mission Street, but they received

confirmation that other team members, including Detective Zuniga, made the turn and had visual contact.

- Defendant was driving with a sense of urgency to regroup with his team.

- Defendant turned onto Leslie, a narrow residential street, and drove the single block to High Street at a minimum average speed of 32 miles per hour and a maximum average speed of 37 miles per hour.

- Defendant entered the intersection against a stop sign driving at least 18 miles per hour.

- Traffic on High Street has the right of way.

- Visibility onto High Street is poor, and a visual obstruction (a retaining wall and hedge) obscured traffic coming down the hill.

- The only safe way to enter High Street is to stop at the stop bar on Leslie and slowly pull forward to confirm whether there is traffic on High Street.

- Agent Hoagland, driving ahead of defendant, slowly turned onto High Street, although he did not completely stop at the stop sign. He then waited at a red light to turn onto Mission Street.

- DEA policies permit agents to violate state traffic laws in certain enforcement situations, but only when doing so does not endanger public and personal safety.

- DEA policies that allow for emergency driving or high-speed pursuit did not apply because there was no emergency or extraordinary circumstance requiring such driving.

- Defendant did not see the victim as he entered the intersection, although the A-pillar inside his truck would not have obscured his view.

- Defendant's conduct represented a gross deviation from the standard of care that a reasonable person would observe in defendant's circumstance.

A rational trier of fact could weigh the foregoing facts and conclude that

defendant's specific conduct—driving through a residential intersection against

a stop sign at 18 miles per hour in the absence of an emergency—was not objectively reasonable. Again, both the district court and this court must begin from the premise that defendant's conduct was criminally negligent, as alleged. The question then becomes whether acting in a criminally negligent manner was *necessary* to carrying out defendant's duties as a federal officer. Those duties, in this circumstance, included regrouping with his team to continue surveilling a subject for whom there was no plan to arrest. Those duties did not include responding to an emergency, performing a high-risk law enforcement action like execution of a search or arrest warrant, or conducting a high-speed pursuit of a fleeing subject. *Cf. Cisneros*, 947 F.2d at 1139 (explaining that federal officer may be entitled to immunity for violation of state traffic laws if the officer needed to violate the law "in order to capture a fleeing felon, or to execute a raid").

Finally, defendant consistently argued below that his conduct must be viewed as objectively reasonable because all DEA agents break traffic laws to carry out their federal duties. The latter statement may be true, in the abstract. But the question presented here is not whether every violation of a state traffic law opens a federal officer to a state criminal charge. The question here is whether defendant's gross deviation from a reasonable standard of care was objectively reasonable in the circumstances because it was necessary to

successfully effectuate his federal duties.  A rational trier of fact could readily

decide that it was not, and the district court erred in concluding otherwise.

## CONCLUSION

This court should reverse the district court's order granting defendant's

motion to dismiss on Supremacy Clause immunity grounds and remand for

further proceedings.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General


/s/  Philip Thoennes

PHILIP THOENNES
Senior Assistant Attorney General
philip.thoennes@doj.oregon.gov

Attorneys for Plaintiff-Appellant
State of Oregon

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(5) and (7), Federal Rules of Appellate Procedure,

I certify that the Appellant's Opening Brief is proportionately spaced, has a

typeface of 14 points or more, and contains 9,668 words.

DATED: April 11, 2025

/s/ Philip Thoennes
PHILIP THOENNES
Senior Assistant Attorney General
philip.thoennes@doj.oregon.gov

Attorney for Plaintiff-Appellant
State of Oregon

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
PHILIP THOENNES
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301
Telephone: (503) 378-4402

Attorneys for Appellant

### IN THE UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF OREGON, | |
| Plaintiff-Appellant, | U.S.C.A. No. 25-447 |
| v. | |
| SAMUEL TROY LANDIS, | STATEMENT OF RELATED CASES |
| Defendant-Appellee. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of

Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellant,

certifies that he has no knowledge of any related cases pending in this court.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General

/s/ Philip Thoennes
_____
PHILIP THOENNES
Senior Assistant Attorney General
philip.thoennes@doj.oregon.gov

Attorneys for Plaintiff-Appellant
State of Oregon

# CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2025, I directed the Appellant's

Opening Brief to be electronically filed with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

/s/  Philip Thoennes

PHILIP THOENNES
Senior Assistant Attorney General
philip.thoennes@doj.oregon.gov

Attorney for Plaintiff-Appellant
State of Oregon

PT4:kw5/987184427